**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

KIESHA WILLIAMS,                                          )
                                                         )
                            Plaintiff,                   )
                                                         )
v.                                                       )          No. 4: 20 CV 1493 DDN
                                                         )
KILOLO KIJAKAZI,                                         )
Commissioner of Social Security,                         )
                                                         )
                            Defendant.                   )

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Kiesha Williams for disability insurance benefits (DIB) under Title II of the Social Security Act, and Supplemental Security Income (SSI) under Title XVI of the Act.  The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the final decision of the Commissioner is reversed and remanded.

## BACKGROUND

Plaintiff was born on October 9, 1977.  (Tr. 527.)  She protectively filed her applications for DIB and SSI on July 2, 2018, and July 1, 2018, respectively.  (Tr. 670, 675.)  She alleged a disability onset date of August 26, 2017, and in her Disability Report, alleged disability due to fibromyalgia, Sjogren's syndrome, arthritis, migraines, pain, lupus, connective tissue disease, insomnia, fatigue, and excessive daytime sleepiness.  (Tr. 720.)  Her claims were denied, and she requested a hearing before an administrative law judge (ALJ).  (Tr. 580, 602, 610.)

On November 25, 2019, following a hearing, the ALJ concluded that plaintiff was not disabled under the Act.   (Tr. 503-16.)   The Appeals Council denied review. Accordingly, the ALJ's decision became the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).   (Tr. 1-7.)

## ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to her appeal.

On January 9, 2016, plaintiff was found to have mild tenderness and swelling in her left metacarpophalangeal joints (MCP) and her proximal interphalangeal joints (PIPs) with normal range of motion in all joints except the fingers due to stiffness and pain. She had multiple tender points consistent with a fibromyalgia.  (Tr. 1039.)

On January 19, 2016, examination revealed tenderness in the bilateral MCPs, wrists, elbows, ankles, and knees with no swelling, but they were all warm.  (Tr. 1044.)

An MRI of plaintiff's right knee was taken on February 8, 2017.  The impression was 1) patellar greater than medial compartment chondrosis with multiple intra-articular bodies in a moderate popliteal cyst; 2) moderate right knee synovitis; 3) healed instrumented tibial tubercle osteotomy; and 4) an intact meniscus. (Tr. 884-85.)

On February 15, 2017, right knee x-rays revealed healed right tibial tubercle realignment osteotomy and mild patellofemoral compartment osteoarthritis.  (Tr. 883.)

On August 4, 2017, plaintiff was seen with a new type of headache following a history of migraines without aura.  Matthew Loftspring, M.D., Ph.D., a neurologist, opined the spells were probably not seizures but rather a response to the stress of having severe headaches every day. He believed the new headaches were likely migraines although they did not meet the formal criteria.  She had a history of migraines without aura that she had experienced since her twenties but rarely experienced now as she avoided triggers such as loud noises, bright lights, crowds of people and insufficient sleep.  She was 5' 10" tall and

weighed 270 pounds.  On exam sensation was decreased to light touch on the right arm.  Topamax, an anti-convulsant, was started.  (Tr. 3822-23.)

August 15, 2017 x-rays suggested hallux valgus or bunions bilaterally and minimal left first metatarsophalangeal joint osteoarthritis.  (Tr. 867.)  She had an elevated erythrocyte sedimentation rate (ESR) or sed rate, a blood test that can reveal inflammatory activity in the body.  (Tr. 894.)

On September 2, 2017, plaintiff was treated in the emergency department for a headache that was constant and lasting for hours.  The headache had occurred over the past week after a fall with intermittent nausea and headache with occasional seeing spots.  On exam she was in mild distress with painful range of motion and she had pain with palpation of the right lateral neck, and pain with moving her neck.  (Tr. 3707.)

On September 25, 2017, plaintiff established care with a new primary care provider, reporting daily headaches and having been recently in the ER for blacking out and hitting her head.  (Tr. 836-38.)

From September 27 through October 3, 2017, plaintiff was hospitalized at Barnes Jewish Hospital under Arun Varadhachary, M.D., PhD., a neurologist, after being seen in the emergency department for spells with headaches.  She reported she had been off work the past month and a half due to difficulty concentrating at work.  She was observed for other events and placed on seizure precautions.  She underwent video EEG monitoring with no epileptic events noted.  She was diagnosed with seizures and discharged as "good."  (Tr. 3693-3703.)

On October 24, 2017, plaintiff was seen by Kelvin Lee, M.D., a rheumatologist, for follow up.  She had continued pain all over her body, worse in her lower extremities, especially during walking.  Exam revealed multiple tender points including areas between her joints.  Gabapentin, used to treat nerve pain, was increased in August due to active exacerbation of her chronic pain, but was not effective, therefore Lyrica was started.  (Tr. 1000-02.)

On October 25, 2017, plaintiff was seen for worsening headaches, exacerbated by noise and lights.  They were mild 5 days a month, otherwise she had 25 migraines per month lasting longer than 4 hours with posterior throbbing pain.  (Tr. 996-99.)  Her medications were adjusted.  Her spells were believed to be a functional reaction to her head pain. (Tr. 3798.)

On December 8, 2017, plaintiff received her first Botox injection for her migraines. (Tr. 993-95.)

On December 13, 2017, a laryngeal video examination revealed evidence of subglottic stenosis or narrowing that was stable compared to a previous exam in January 2017.  Randal C. Paniello, M.D., otolaryngologist, recommended a direct laryngoscopy to rule out subglottic stenosis.  (Tr. 989-90.)

On December 29, 2017, plaintiff underwent a microlaryngoscopy and laryngotracheal dilation for recurrent laryngotracheal stenosis.  (Tr. 3690-91.)

On January 9, 2018, plaintiff was seen for behavioral evaluation and treatment of her insomnia.  (Tr. 980-83.)

On January 12, 2018, plaintiff saw her rheumatologist and reported continued pain all over her body.  She reported she was on extended leave from work.  On exam she had multiple tender points including areas between joints.  Her medications were increased.  Imaging of her hands and wrists produced normal results.  (Tr. 858-64). During an appointment, plaintiff reported that a nerve pain medication had provided "about a 60% improvement in her pain," which was "all over her body."  The physician noted there "continue[d] to be no definitive evidence" of swelling in her hands, wrists, elbows, knees, ankles, or feet.  Given her improvement with the medication, the physician increased the dose of plaintiff's nerve pain medication with hopes of even greater improvement.  (Tr. 976-78.)

On January 26, 2018, plaintiff reported more severe headaches since her last visit with Dr. Loftspring.  In the past month she had six headache-free days and ten migraines.  She reported that she was exercising more than 90 minutes per week.  Her Lyrica was

increased.  Cymbalta was helping some, but not significantly.  Her sleep was still poor.  She reported blurred vision in both eyes.  Her Cymbalta was increased, and she was referred for Botox injections.  (Tr. 973-75.)

On January 31, 2018, plaintiff was treated in the ER with right-sided chest pain for the past two days with shortness of breath, which was likely fibromyalgia pain as it was reproducible with palpation and she had signs of allodynia, or extreme sensitivity to touch, on her chest.  Her diagnoses included atypical chest pain, migraines, Sjogren's disease, and fibromyalgia.  (Tr. 3672-79.)

On February 12, 2018, plaintiff saw her primary care physician for evaluation of chest pain.  In light of a negative workup, her doctor opined it was of unclear etiology and unlikely cardiac or pulmonary in nature.  (Tr. 841-43.)

On March 13, 2018, plaintiff saw Dr. Loftspring.  She reported 30 headache days per month, 20 migraine days per month, and 10 severe migraine days per month.  She received a second Botox injection.  (Tr. 970-72.)

On April 24, 2018, plaintiff saw her rheumatologist with ongoing pain and insomnia.  She had all over body pain.  A sleep study showed mild obstructive sleep apnea.  She was positive for oral and ocular dryness and chronic ongoing migraine headaches.  Examination revealed multiple tender points including areas in between joints.  Diagnoses were Sjogren's syndrome, chronic pain syndrome, chronic insomnia, recurrent subglottic stenosis, and high-risk medication use.  (Tr. 967-69.)

On April 27, 2018, plaintiff saw Dr. Loftspring.  The Botox injection from March did not provide improvement.  She had severe migraines for 2 weeks with blurred vision.  The current pain was squeezing, severe, and vice-like, and bilateral.  Dr. Loftspring recommended another Botox injection as it can take two sets of injections to see improvement.  He was concerned about plaintiff's Tylenol use because it can cause headaches from overuse.  (Tr. 963-66.)

On June 15, 2018, at the sleep clinic, plaintiff reported she continued to be fatigued.  She reported she moved back to her home after her last session, so she is no longer

- 5 -

homeless/staying with a friend.  She reported she no longer works at the previous job because she fell asleep due to the sedentary and boring work.  She reported she just sat there and did nothing and fell asleep.  She generally takes her granddaughter to school and then sleeps from 9:30 or 10:00 a.m. until noon unless she has errands.  She takes another nap around 2:30 or 3:00 p.m. for 30 to 60 minutes before she goes to work in the evening three days pers week from 5 to 7:30 p.m.  She reported she may nap at work while caring for an autistic person because it is boring.  She reported sleeping too much and wanting to stay awake during the day.  She reported she was opening a community center and was waiting on $1 million funding from a donor.  She reported having all the paperwork, structure, and network in place.  She reported she does errands all day.  She takes naps and is exhausted from "serving as the family Uber."  She continues to fall asleep because she is bored.  The sleepiness intrudes even when she is busy and excited and working on stuff. This has been a problem for the past one to two years.  She reported relying on her personal assistant to help her remember things.  She reported needing to get to a functional level so she can be present and reliable with her business.  (Tr. 3840-41.)

On June 19, 2018, plaintiff was slightly better but still struggling with headaches. New medications were prescribed.  She received a third Botox injection.  She felt some benefit from the last injection, but it wore off about three weeks ago.  Since starting Botox, she has had 10 migraine-days per month, 5-7 headache-days per month, and 5 severe migraines per month.   Dr. Loftspring's notes state she has tried multiple preventive medications without sufficient benefit or with side effects.  (Tr. 1068-74.)

Plaintiff was admitted to Barnes Jewish Hospital from June 26-28, 2018, for a severe migraine after receiving her last Botox injection on June 19.  Her migraine from the past week had continued since then.  She noticed her left eyelid was drooping and decreased sensation to the left face/arm/leg which she had never experienced before with her migraines.  On exam, she appeared very uncomfortable and was lying in bed with her eyes closed.  She had decreased sensation to the left face and left arm and leg with left eye ptosis.  (Tr. 3837.)  She was treated with Depakote, used to treat migraines, but was still

- 6 -

experiencing headaches at the time of discharge. She was discharged despite continued migraine symptoms. (Tr. 908-10.)

On July 17, 2018, plaintiff visited the emergency room after she was cleaning her refrigerator and heard a "pop." She described her left knee as very swollen and painful. She could walk on it, but it worsened the pain. On examination, plaintiff had mild swelling in her left knee. She did not want to address her headache. Her left knee x-ray showed mild arthritis. She was discharged home and advised to follow up as an outpatient. (Tr. 1220-24, 1232-33.)

On July 24, 2018, plaintiff returned to her rheumatologist, reporting severe pain in her upper and mid-back, both knees, and lateral side of the hips. She reported she was trying to get disability. She reported she was not able to walk more than 10 minutes and could not stand for more than 10 minutes due to pain. She reported pain in the bottom of her ankles that gradually affects her toes if she walks or stands for long. She described the pain as stabbing, tingling, and gradually radiating. Neurology had given her prednisone taper for her migraines, and she reported while taking prednisone her joint pain was better. She had recently been seen in the emergency room for left knee pain on July 18, 2018. She reported the area was very swollen and painful, and although she could ambulate and bear weight, it caused increased pain. Left hip and knee x-rays on July 17, 2018, revealed mild tricompartmental left knee osteoarthritis. A review of systems was notable for photosensitivity, malaise, headaches, afternoon fatigue, eye symptoms, joint pain and swelling, morning stiffness, and dry mouth and eyes. (Tr. 3852.) An exam showed multiple tender points. However, her arthralgia responded to a steroid, and an ultrasound was ordered to evaluate her synovitis. (Tr. 1075-78.)

On August 10, 2018, plaintiff had multiple tender points, including areas in between joints. An antinuclear antibody (ANA) test was positive, indicative of an autoimmune disorder. Given her photosensitivity, migraine, malar rash and arthralgias, she was noted to likely have systemic lupus erythematosus (SLE) in addition to Sjogren's syndrome. (Tr. 1081-84.)

- 7 -

On September 7, 2018, Renu Debroy, M.D., state agency physician, reviewed plaintiff's file and concluded plaintiff could perform light work but could only occasionally climb ladders, ropes or scaffolds and could frequently climb ramps and stairs, stoop, kneel, crouch and crawl.  He advised she should avoid concentrated exposure to noise and pulmonary irritants.  (Tr. 584-89.)

September 12, 2018 rheumatology notes indicate physical exam showed multiple tender points, including areas in between the joints, as well as swelling and tenderness in the right 2nd digit extensor tendon.  She reported severe pain in her upper and mid back, both knees, and lateral side of the hips.  She had developed swelling and pain to the point she was unable to flex her right index finger.  (Tr. 3505-10.)

In an October 22, 2018 letter, Dr. Loftspring stated, "I am currently treating [plaintiff] for chronic migraines. Chronic migraine can be a debilitating disease, as is her case.  Common symptoms aside from pain include memory and attention problems as well as potentially (sic) anxiety and depression. Therefore, this disease is causing more symptoms other than pain."  (Tr. 3957.)

In an October 16, 2018 letter, Michiko Inaba, M.D., a rheumatologist, stated, "This patient is currently being treated in my office for Lupus and Sjogren's disease.  This can affect her ability to work in a physically demanding capacity."  (Tr. 3956.)

From October 16 to November 2, 2018, plaintiff was hospitalized at Barnes Jewish Hospital for an intractable migraine that lasted three weeks.  She had difficulty opening her eyes and complained of photophobia. While there she had little improvement in her pain and continued to have photophobia, phonophobia, nausea, and double vision.  Neurology exam noted that she appeared uncomfortable and had diminished light touch in the left upper extremity.  Despite medication changes, there was little improvement in her symptoms. While there she also complained of generalized weakness with difficulty standing and being barely able to walk across the room.  She continued to experience hyperesthesia to light touch in the left upper and lower extremities.  After several days she had no improvement in her migraines and was started on Geodon with no significant

- 8 -

improvement.  Prior to discharge she complained of diffuse weakness and had difficulty standing/walking, but due to lack of insurance, a transfer to a skilled nursing facility or inpatient rehabilitation was not an option.  Nor did she have a diagnosis that would qualify her for rehabilitation.  Treatment options were limited by her long list of allergies.  Her doctors believed it was unlikely that they would be able to achieve significant headache control keeping her as an inpatient.  Plaintiff was discharged despite the lack of improvement as there were no further medications they could offer her for her symptoms. She was discharged with Dexamethasone and Fioricet as needed.  (Tr. 1291-1642.)

On November 26, 2018, plaintiff saw her primary care provider following her hospitalization and continued to report headache pain of 9/10. She reported feeling unsteady and continued to have mild photophobia and phonophobia.  Due to the complexity of her symptoms, her primary care provider left further management to her neurologist. (Tr. 2079-83.)

On December 16, 2018, plaintiff was seen in the emergency room for chest pain. Labs and EKG were negative.  She was diagnosed with atypical chest pain and advised to follow-up with her primary care provider.  (Tr. 2003-41.)  On December 20, 2018, plaintiff saw her primary care physician after her ER visit.  He opined she had vasospasm.  (Tr. 1972.)

On January 16, 2019, plaintiff was seen in the emergency room for right elbow pain. She had lifted a child's recliner chair and had heard a pop in her right elbow that was followed by elbow pain.  She had no obvious swelling.  An x-ray of her right elbow was normal.  Exam revealed tenderness over the right lateral epicondyles at the radial head. She had limited elbow flexion secondary to pain.  She was placed in a sling and discharged home.  (Tr. 1923-35.)

On January 17, 2019, plaintiff complained of ongoing headaches and weakness, as well as chest and elbow pain with swelling.  She requested an MRI of her elbow.  On exam she had pain with resisted supination of the elbow and with flexion of the elbow, worse

along the lateral epicondyles.  She had pain with palpation of the lateral and medial epicondyles.  (Tr. 1330.)

On March 8, 2019, plaintiff was seen for rheumatology follow-up and complained of hand pain and swelling.  Her medications were continued.  (Tr. 3512-18.)

On March 14, 2019, plaintiff saw her primary care physician and complained of daily chest pain with shortness of breath and palpations.  She continued to have right elbow pain with numbness and tingling in her fingers and was unable to use her right arm.  Her pain was worse with movement, but she was unable to go to pain management due to lack of insurance.  On exam there was pain with palpation in the elbow, as well as pain with resisted supination and flexion, worse along the lateral epicondyles.  There was pain with extension of her digits and her range of motion was limited by pain.  There was tenderness to palpation over the left chest.  She was scheduled for elbow injection through her rheumatology provider.  (Tr. 1729-32.)

On March 22, 2019, plaintiff saw Dr. Inaba reporting pain in her wrists and knuckles and morning stiffness for two to three hours. Review of systems was notable for photosensitivity, malaise and headaches, afternoon fatigue, dry mouth, dry eyes, joint pain, joint swelling, and morning stiffness. On exam she had tenderness over the right lateral epicondyle.  She had tenderness to palpation in the knuckles and wrists without swelling. She had multiple tender points in the upper back.  Ultrasound of her right elbow revealed hyperemia or an excess of blood in a part of the body.  The right wrist ultrasound revealed synovial hypertrophy and mild hyperemia. The diagnosis was mild right inflammatory arthritis of the right wrist. Ultrasound of the right hand and wrist was negative. (Tr. 3521-27.)

On March 27, 2019, plaintiff met with her internist and reported arm pain. She reported that the steroid injection had not helped.  She was wearing a wrap on her right elbow.  She reported she had pain extending from her right elbow to her right hand, as well as numbness and tingling in her fingers.  She was not able to use her right arm at all.  On examination, she had no swelling in her right

- 10 -

elbow or arm. Her internist advised her to continue the steroid and to ask her rheumatologist about further imaging and an injection for her right elbow. (Tr. 1729-32.)

On March 29, 2019, an in-home health care and evaluation intake was performed. Plaintiff began receiving in-home care beginning April 2019 for a total of 485 minutes per month. She received help with bathing, medications, dressing, mobility, and meal preparation and eating. Other tasks included changing linens, cleaning, and transportation. (Tr. 3974-78.)

An April 19, 2019 exam revealed she had tenderness to palpation in her knuckles, PIPs, and wrist with swelling. She had multiple tender points in her upper arms. Her medications were changed. (Tr. 3542.)

On May 8, 2019, plaintiff was seen by her primary care provider. Exam revealed pain with palpation of the lateral elbow and pain with resisted subornation of the elbow and with flexion, worse along the lateral epicondyles. Her range of motion was limited by pain and there was tenderness to palpation over the left chest. (Tr. 2355-56.)

At a May 10, 2019 follow-up, plaintiff reported morning stiffness throughout the day. A review of systems was notable for photosensitivity, malaise and headaches, afternoon fatigue, dry mouth, eye symptoms, joint pain, swelling and morning stiffness. She reported her pain was worse and she did not think her medications were helping. She reported her pain persisted throughout the day and she could barely dress herself. (Tr. 3537, 3553-56.)

In May 2019, plaintiff underwent surgery, a resection of a scar at an old tracheostomy site, for recurrent tracheal stenosis. On June 17, 2019, she reported improvement after the resection but that she continued to experience dyspnea on exertion. Her doctor believed this suggested lung disease and referred her to pulmonology. (Tr. 3575-78.)

On June 14, 2019, plaintiff saw her rheumatologist. She reported that she had been doing well except burning sensation in her left thigh that was uncomfortable to even light touch. On examination, she had swelling in her knuckles but not in her knees, ankles, or

feet.  The rheumatologist ordered imaging of plaintiff's hand and blood testing.  (Tr. 3567-69.)

On June 17, 2019, plaintiff was seen for urinary incontinence for the past year.  She reported leakage of urine with coughing, laughing, and sneezing, as well as with urge.  She did not feel her bladder emptied completely.  She also reported diarrhea and fecal incontinence of loose stools.  Plaintiff was diagnosed with mixed urinary incontinence, stress urgency and frequency, pelvic floor muscle dysfunction/pain/spasms and diarrhea, and fecal incontinence.  She was referred for pelvic floor physical therapy.  (Tr. 3443-57.) She underwent physical therapy from July 28 through August 28, 2019, for pelvic floor disorder.  (Tr. 3617-51.)

On July 16, 2019, she had an MRI of her wrists and hands.  Diagnosis was mild nonspecific bilateral metacarpal phalangeal joint synovitis.  (Tr. 3398, 3573.)

On July 17, 2019, plaintiff saw Dr. Loftspring for her recurrent headaches.  She had been on Ajovy, for migraines, which worked well initially but lost some effect, so she stopped taking it.  She had had the same problem with prior medications.  She reported Botox gave her a severe headache but appeared to be helping.  Emgality, another migraine medication, was prescribed.  (Tr. 3579-85.)

On August 1, 2019, plaintiff was seen for mixed stress and urge urinary incontinence.  Despite being in PT for bladder training for about one month she continued to require six to eight diapers per day as she can have three episodes of urinary incontinence per day as well as two to three episodes of stool incontinence.  It was recommended she wear diapers.  (Tr. 3357.)

On August 27, 2019, plaintiff was evaluated for shortness of breath.  Her doctors thought a significant reason for her shortness of breath was due to deconditioning and obesity.  Her symptoms suggested asthma and she was given an inhaler.  They also indicated there may be some component of her dyspnea that may never improve and may be related to her persistent tracheal issues.  (Tr. 3590-93.)

- 12 -

On September 13, 2019, plaintiff was seen in orthopedics for continued right elbow pain.  The physician noted she was very lethargic during the exam and kept her eyes closed most of the time.  A steroid injection was administered.  (Tr. 444-45.)

During a December 9, 2019 vision exam, plaintiff was noted to be falling asleep during the test.  (Tr. 471.)

On February 18, 2020, plaintiff was instructed to use a single point cane until she was able to see physical therapist for ankle pain, due to decreased foot clearance on right lower extremity.  (Tr. 355.)

## ALJ HEARING

On August 27, 2019, plaintiff appeared and testified to the following before an ALJ. (Tr. 522-77.)  Her days depend on how she feels.  She has good days and bad days.  She does not do laundry because it requires going down stairs.  She does not mop or vacuum and does not put dishes in the dishwasher, but she does rinse and put them in the sink.  Her daughter and father help with taking out the trash, grocery shopping, and preparing her meals, although she can make sandwiches or oatmeal.  She attends church if she feels ok. She can drive and other times others pick her up.  She researched information about opening a community center but was not able to because she became sicker.  (Tr. 549-57.)

Once or twice a week she might call her daughter and have her bring her granddaughter over for the day if she is feeling good.  Her granddaughter might spend the night every other weekend.  Her four-year-old granddaughter is very independent and can make her own food and occupy herself if plaintiff is not feeling well.  She uses a motorized grocery cart if she can find one, otherwise she needs to sit and rest during her shopping trips and can only be on her feet 15-20 minutes at a time.  In church she must constantly move around.  She sits in the back of the church so she can move from chair to chair or elevate her legs.  She sometimes needs to lean against the wall of the church if it gets really bad.  She has missed church on account of swollen legs and feet or pain in her back and hips.  She has missed church about 60% of the time in the past two years.  (Tr. 559-63.)

A vocational expert also testified at the hearing.  (Tr. 571-78.)  The vocational expert testified that a hypothetical individual at the light exertional level with limitations that would become plaintiff's residual functional capacity could perform plaintiff's past relevant work, as usually performed, including office manager, teacher aide, administrative assistant, branch manager, receptionist, and cashier-checker.  (Tr. 574-75.)

## DECISION OF THE ALJ

On November 25, 2019, the ALJ issued a decision finding that plaintiff was not disabled.  (Tr. 503-16.)  At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 26, 2017, her alleged onset date.  At Step Two, the ALJ found plaintiff had the following severe impairments:  lupus, obesity, migraine headaches, degenerative joint disease of the left knee, subglottic stenosis, Sjogren's disease, chronic pain syndrome, right lateral epicondylitis, and rheumatoid arthritis.  The ALJ found plaintiff's urinary incontinence was being managed medically and should be amenable to proper control by adherence to recommended medical management and medication compliance.  The ALJ concluded no aggressive treatment was recommended or anticipated, and therefore her urinary incontinence was nonsevere.  (Tr. 507.)  The ALJ found fibromyalgia was not a severe impairment because plaintiff does not have the requisite number of tender points.  At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1.  (Tr. 503-10.)

The ALJ determined that plaintiff had the RFC to perform "light" work as defined under the regulations with the following limitations:

> [S]he can perform work requiring lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking 6 hours in an 8-hour workday, and sitting 6 hours in an 8-hour workday.  [She] can push and/or pull 20 pounds occasionally and 10 pounds frequently.  [She] can frequently climb ramps and stairs; and frequently climb ladders, ropes or

- 14 -

scaffolds.  She can frequently stoop, kneel, crouch, and crawl.  She should never be exposed to concentrated levels of dusts, odors, fumes and pulmonary irritants; vibrations, and can work up to the moderate noise level.

(Tr. 510.)  The ALJ concluded, with VE testimony, that plaintiff could return to her past relevant work as an office manager, teacher aide I, administrative assistant, branch manager, receptionist, and cashier/checker.  Accordingly, the ALJ concluded that plaintiff was not disabled under the Act.  (Tr. 515.)

## GENERAL LEGAL PRINCIPLES

In reviewing the Commissioner's denial of an application for disability insurance benefits, the Court determines whether the decision complies with the relevant legal requirements and is supported by substantial evidence in the record. *See* 42 U.S.C. 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  The review considers not only the record for the existence of substantial evidence in support of the Commissioner's decision. It also takes into account whatever in the record fairly detracts from that decision. *Cox v. Apfel,* 160 F.3d 1203, 1207 (8th Cir. 1998).  We may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an

- 15 -

individual is disabled.  20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process); *Pates-Fires,* 564 F.3d at 942.

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW).  *Id.* § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to do so.  *Pate-Fires*, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## DISCUSSION

Plaintiff asserts the ALJ erred when considering her migraine headaches, her subjective allegations, and her RFC.  Defendant counters that plaintiff merely disagrees with the ALJ and is merely asserting that certain evidence could support her position.  Defendant also complains that portions of the medical record evidence fall outside the alleged period of disability.

### Migraine Headaches

Plaintiff argues the ALJ erred in her pain evaluation, specifically as it relates to her migraines.  The ALJ found that plaintiff suffers from migraines as one of her severe impairments.  Plaintiff argues the ALJ erred by failing to conduct an adequate evaluation of the impact of such headaches when formulating her RFC finding.  She further argues some of the ALJ's analysis is erroneous.   The Court agrees.

For example, in addressing plaintiff's migraines at Step Four, the ALJ claimed that his RFC finding is consistent with "the objective medical evidence" as an "MRI of the brain performed on February 13, 2018, showed no acute intracranial process." (Tr. 514.) The ALJ also referenced a record from October 3, 2017, indicating plaintiff's migraines began in her early 20's but that plaintiff stated, "she gets them rarely now" and avoids triggers, including bright lights, loud noises, being around a lot of people and not sleeping. The ALJ also referenced an October 26, 2018 treatment note where plaintiff reported right-sided weakness and left-sided numbness but exam was notable for largely functional findings. Additionally, the decision notes she was prescribed Avjoy, which she reported was working well, but lost some effect so she switched to Emgality. (Tr. 514.)

The ALJ did not completely describe the record evidence. The record evidence showed plaintiff had experienced two different types of headaches. Plaintiff stated that she had migraines in her 20's but rarely got them now because she avoids triggers. However, she reported she now experienced a different type of headache, described as squeezing, severe, vice-like, and bilateral. The first time she had this type of headache was a few months earlier. Her neurologist believed the new headaches were migraine. (Tr. 844.) The ALJ's reference that she "she gets them rarely now" is erroneous since it does not refer to the migraines she was getting since her onset date. Also, although the decision points out the MRI of her brain did not reveal any acute findings, the MRI did show findings which can be seen in a setting of chronic migraine headaches. (Tr. 89.) The ALJ also noted that according to treatment notes plaintiff's headaches showed improvement since starting medication.

The Court agrees with plaintiff that the ALJ failed to meaningfully discuss the functional impact of these headaches on plaintiff's functional capacity in its decision. The regulations define RFC as the most an individual is still able to do despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). Moreover, the ALJ will "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the case. 20 C.F.R. § 404.1520(e).

- 17 -

In this case the ALJ substantially ignored the record evidence of ongoing migraines and failed to make a meaningful provision for these effects in the RFC finding.  The record evidence shows plaintiff cannot perform sustained work functions during her migraine headache episodes; therefore, the RFC would have had to reflect the need for absences. *See Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998) (if excessive absenteeism is caused by a claimant's impairment, it should be included in the RFC and considered by the vocational expert); *see also Youness v. Berryhill***,** Case No. 17-cv-4108 (DSD/BRT), 2018 WL 2716301, at *10 (D. Minn. May 18, 2018) (finding an RFC unreliable when it did not include limitations associated with more than usual off-task time or absenteeism).

In this case, the relevance of plaintiff's migraines involves plaintiff's ability to engage in steady employment.  The VE testified that if an individual has symptoms that result in two or more days a month of absenteeism, the individual would not be competitively employable. As noted, at Step Two the ALJ included migraine headaches as a severe impairment suffered by plaintiff and referenced Dr. Debroy's administrative finding that plaintiff had a history of migraines.

In her decision the ALJ gave insufficient consideration of the record's documentation of the effect of plaintiff's migraines when determining her RFC. In her written decision the ALJ acknowledged only that plaintiff reported migraines, but only to the extent that an October 3, 2017 record indicated that plaintiff's migraines began in her early 20's but rarely occur currently, because she avoids their triggers.  (Tr. 514.)  The ALJ then referenced plaintiff's February 2018 MRI that "showed no acute intracranial process (Exhibit 2F/14)."  (Id.)  The ALJ then acknowledged that plaintiff received a Botox treatment and on her own took daily Tylenol for her migraines.

The ALJ's reference to the 2018 MRI implied that a normal MRI is inconsistent with the other record evidence of debilitating migraine headaches.  This is not only insufficient to support the ALJ's RFC finding, but also error, because without further medical expertise in the record it indicates a misunderstanding of assessment of migraine headaches.  *See generally*,  https://www.mayoclinic.org/diseases-conditions/migraine-

headache/diagnosis-treatment/drc-20360207.   Neither the occurrence nor the severity of migraine headaches is specifically detectable through such testing.  *Id.*  MRIs are used, not to positively diagnose migraines, but to determine other cause(s) of the patient's affliction.  *See     generally*,     https://www.mayoclinic.org/diseases-conditions/migraine-headache/diagnosis-treatment/drc-20360207.     Thus, the Court is not aware of a requirement that the severity of migraines be proven through objective clinical findings.

The Court also notes there is no record evidence that any treating doctor, including plaintiff's neurologists, questioned whether plaintiff had migraines or was exaggerating her symptoms.  *See Abbruzzese v. Astrue*, 2010 WL 5140615, at *7 (W.D. Penn. Dec. 9, 2010) (acknowledging that physicians find migraines "where symptoms are typical and results of physical examination (which includes a neurologic examination) are normal" and that "[n]o procedure can confirm" the headaches).  Based on the above, the ALJ failed to provide an adequate assessment of plaintiff's migraine headaches in the development of her residual functional capacity.

### Residual Functional Capacity

Plaintiff next argues the RFC is not supported by substantial evidence.  She asserts that despite severe impairments of epicondylitis and rheumatoid arthritis (RA), with evidence of active synovitis and swelling with complaints of pain and difficulty using her hands, the RFC does not include any limitation with plaintiff's hands or arms beyond the lifting restriction included with light work.  The decision fails to explain how the MRI and ultrasound evidence regarding plaintiff's hands and arms fails to provide support for manipulative limitation.  She also notes her diagnoses include Sjogren's syndrome, lupus, RA, and chronic pain disorder with consistent ongoing complaints of pain.  The ALJ's finding that plaintiff has the ability to stand and walk 6 hours in an 8-hour workday is without substantial evidentiary support in the record.  Plaintiff complains that the only evidence that supports this conclusion is the opinion of the state agency medical consultant, Dr. Debroy, dated September 7, 2018.   However, treatment records after Dr. Debroy's September 2018 opinion demonstrate findings inconsistent with his conclusion.  (Tr. 444-

45, 471, 1291-1642, 2079-83, 3537, 3553-56, 3956.)  The Court also concludes that the record does not support the finding that plaintiff, with the severe impairments found by the ALJ, at 39 years of age, 5 feet 10 inches tall, and weighing 270 pounds, can frequently climb ramps and stairs, frequently climb ladders, ropes, or scaffolds, and frequently stoop, kneel, crouch, and crawl.

### Subjective Allegations

Plaintiff complains the ALJ failed to discuss record evidence supporting her allegations, particularly after Dr. Debroy's September 2018 opinion.  In this case the ALJ focuses on negative testing, including imaging of the hip, femur, tibia, hands, and wrists, as well as physical exams showing the lack of synovitis in the wrists, elbows, knees, ankles, and feet.  It also points to a negative elbow x-ray in January 2019 and repeatedly references the lack of synovitis.

The ALJ indicated the record contains inconsistencies between the allegations and the medical record evidence.  For example, one inconsistency cited was plaintiff's testimony that she lives alone, but needs help dressing, bathing, etc.  However, plaintiff testified that in early 2019 her condition worsened to the point she began requiring assistance with day-to-day activities.  Consistent with that testimony is evidence that she began receiving home health care in April 2019.  The ALJ failed to explain how this is inconsistent with plaintiff's allegations.

The ALJ also indicated the record is not consistent because a record from June 15, 2018, documented plaintiff had a large bed she shared with her granddaughter who had been with her for 3 days and would be with her for at least a month and that she would take granddaughter to school.  Again, the ALJ failed to indicate how these activities are inconsistent with plaintiff's allegations.

The decision also points out plaintiff indicated working part-time for an autistic person and planned to open a community center and was waiting on funding.  (Tr. 513.)  However, plaintiff testified that she never opened the community center because she became sicker.  (Tr. 559-63.)  Again, the ALJ failed to explain how this was inconsistent

with her allegations of disabling impairments. The records indicate plaintiff worked for a short time doing in home health for an autistic person on a part-time basis, 2 ½ hours per day.  The same visit cited by the ALJ also indicates that plaintiff at times fell asleep while at work.  (Tr. 3840.)  The Court concludes the ALJ erred in failing to explain the perceived inconsistencies.  *See Reed v. Barnhart*, 399 F. 3d 917, 922 (8th Cir. 2005) (ALJ failed to explain evidence he relied on, in violation of SSR 85-16, which provides that consideration be given to the quality of daily activities and the ability to sustain activities, interests, and relate to others over a period of time and that the "frequency, appropriateness and independence of the activities must also be considered.").

## VI.  CONCLUSION

For the reasons set forth above, the Court concludes the ALJ erred in evaluating plaintiff's migraine headaches and her subjective pain complaints.  Therefore the ALJ did not base the RFC on substantial evidence.  The decision of the Commissioner of Social Security is reversed and remanded for reconsideration of plaintiff's applications for disability insurance and supplemental security income benefits.   A separate Judgment Order is issued herewith.


_____/s/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**
Signed on March 18, 2022.

- 21 -